**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-CR-00397-CMA-01

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1.  JOEL THOMAS

     Defendant.

---

**DEFENDANT'S MOTION FOR DOWNWARD VARIANT SENTENCE**

---

Defendant Joel Thomas ("Joel"), by and through his attorney, hereby submits his Motion for a Downward Variance from the sentencing guidelines range in this matter. More specifically, Joel requests that the Court vary from the applicable guideline range of 63-78 months incarceration, impose a sentence shorter than the probation department's recommended sentence of 63 months, and consider a sentence to probation.

**A.    Introduction and Background.**

Since *United States v. Booker,* 543 U.S. 220 (2005), the range of sentencing options has been significantly broadened. *See, e.g. Spears v. United States,* 555 U.S. 261 (2009); *Gall v. United* States, 552 U.S. 38 (2007); *Kimbrough v. United States,* 552 U.S. 85 (2007); *Rita v. United States,* 551 U.S. 338 (2007). A district court must give "respectful consideration" to the Guidelines, but is permitted "to tailor the sentence in light

of other statutory concerns as well." *Kimbrough* 552 U.S. at 101 (internal quotations omitted). In this case, the sentencing evidence demonstrates that a variant sentence below the otherwise applicable guideline range is appropriate.

1.      *Factual Background.*

As set forth in greater detail in the plea agreement, Joel's case arose from the multi-national investigation of the internet anonymity network known as "Tor." Joel was identified among the more than 200,000 individuals who regularly used the Tor system to share and access child pornography. Specifically, the email address buketgrl1@[AES].org was tied to two websites, on which the "buketgrl1" user posted messages and attachments between June 2012 and July 2013. The messages referenced, and the attachments contained, sexually explicit photographs of prepubescent females. *See* (Doc. #16 at 14-18).

A subpoena to online payment facilitator PayPal indicated that Joel was associated with the buketgrl1 email address so, in November 2013, investigators executed a search warrant at Joel's home and seized Joel's computer. A forensic exam of the computer uncovered evidence of use of the bucketgrl1 email and the suspect websites, and other indicia of accessing child pornography. The investigation also determined that the images associated with buketgrl1's posting to the website were known by law enforcement to have been produced outside Colorado. Joel is not suspected of producing any child pornography. (Doc. #16 at 18-22).

Despite having seized Joel's computer in 2013, the government did not bring a case or otherwise pursue its allegations against Joel until late 2019 when the United

States Attorney's Office notified undersigned counsel that it would now be pursuing a prosecution against Joel.  There is no evidence that Joel engaged in illegal acts in the interim.  Indeed, as will be described in greater detail below, the evidence and Joel's post-offense rehabilitative conduct allows one to reasonably conclude that Joel was "scared straight" by the FBI search warrant and thereafter has led a law-abiding life.

   2. *Plea Agreement.*

   Joel and the government conducted pre-filing negotiations to resolve the case through disposition and on September 11, 2019, Joel was charged by Information with one count of accessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2).  (Doc. #1).  Joel and the government entered into a Plea Agreement on October 2, 2019, pursuant to which Joel agreed to plead guilty to the one count of the Information.  (Doc. #16).   After applying stipulated adjustments and a three-point reduction for acceptance of responsibility under USSG § 3E1.1, the parties calculated an adjusted offense level of 26.  (*Id.* at 23-24).  Combining that offense level with Joel's lack of a criminal history resulted in a guideline sentencing range of 63 to 78 months.  (*Id.* at 24).  The applicable statute, however, does not mandate a minimum sentence.  18 U.S.C. § 2252A(b)(2).

   The government agreed to request a sentence at the bottom of the parties' estimated guideline range, i.e., 63 months.  (Doc. #16 at 6).  Unlike many plea agreements in this district involving violations of 18 U.S.C. § 2252A, however, the agreement does not preclude Joel from arguing for a variant sentence below the calculated guideline range.

3.    *The Presentence Report.*

On December 10, 2019, the United States District Court Probation Office (the "Probation Office") filed its draft Presentence Investigation Report ("PSIR").  (Doc. #18). The PSIR adopts the parties' stipulated facts, guideline calculation, and restitution.[1]  The Probation Office also concurs with the government's desired sentence, recommending a sentence of 63 months incarceration, followed by 5 years supervised release.  (Doc. #18-1 at 1).

**B.    Applicable sentencing law.**

After *Booker* invalidated the mandatory features of the United States Sentencing Guidelines, Justice Breyer noted that "the substantive difference between a 'variance' and a 'departure' is nonexistent."  *Irizarry v. United States*, 553 U.S. 708, 718 (2008) (Breyer, J., dissenting) (citations omitted).    Nevertheless, in exercising their discretion in fashioning a criminal sentence, courts typically calculate the recommended guideline range under the advisory Sentencing Guidelines, then determine whether to apply an upward or downward "departure" based on "application of Chapters Four or Five of the Guidelines" and/or an upward or downward "variance" through "application of the sentencing factors in 18 U.S.C. § 3553(a)."  *United States v. Barajas- Garcia*, 229 Fed. Appx. 737, 740 (10th Cir. 2007) (citations omitted).

---

[1]    One victim depicted in the images forming the basis of Joel's plea has come forward seeking $5000 restitution.  This demand is $2000 more than the government seeks per victim.  Nevertheless, Joel is willing to make such restitution, which he considers integral to his rehabilitation.  The Probation Office recommends assessing the restitution amount upon sentencing, (Doc. #18-1 at 3), and Joel stands ready to make restitution in that amount immediately.

Regarding variances, the Supreme Court has rejected the assertion that extraordinary circumstances are required to vary downward in a sentence; the district court, upon considering the applicable sentencing factors, has the discretion to impose any sentence it deems reasonable (within the bounds of the applicable statute and plea agreement).  *Gall*, 552 U.S. at 46-47.  The sentencing court is not bound to "choose one Guideline range in particular, and is free to take the more flexible – and often, more direct – approach of arriving at a more appropriate sentence outside the Guidelines.  In light of *Booker*, the judge could simply look at all of the facts, take [the parties'] suggestions into account, consider the § 3553(a) factors, and come up with a 'hybrid' approach if [s]he so chose."  *United States v. Dhafir*, 577 F.3d 411, 415 (2d Cir. 2009).  In short, while a sentencing court "must include the Guidelines range in the array of factors warranting consideration . . . [t]he judge may determine, however, that, in the particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing."  *United States v. Lopez-Macias*, 661 F.3d 485, 492 (10th Cir. 2011) (quoting *Kimbrough*, 552 U.S. at 91).

In determining an appropriate sentence, the factors to be considered "include the nature of the offense and characteristics of the defendant, as well as the need for the sentence to reflect the seriousness of the crime, to provide adequate deterrence, to protect the public, and to provide the defendant with needed training or treatment."  *United States v. Kristl*, 437 F.3d 1050, 1053 (10th Cir. 2006) (citing 18 USC § 3553(a)(1)-(2)).  In considering those factors and determining a sentence, the sentencing court "must also adhere to the substantive mandate of the sentencing statute by imposing a term of

imprisonment that is 'sufficient, but not greater than necessary' to facilitate the statute's goals.  *United States v. McGuire*, 441 Fed. Appx. 586, 588 (10th Cir. 2011) (quoting 18 USC § 3553(a)).

### C.    A variant sentence is adequate to reflect the seriousness of the offense of conviction and the characteristics of the defendant.

The offense is a serious one, and the damage to the impacted victims – especially "Henley," who submitted a Victim Impact Statement – will not be minimized.  That does not mean that meaningful distinctions between the types of child pornography offenses, or the defendant's otherwise admirable characteristics should be ignored.   Further, Joel presents before this Court in an unusual situation as his plea agreement with the government does not require a prison sentence.  Rather, the Court has the opportunity to sentence an offender such as Joel to a lower sentence to include probation.  While undersigned counsel would not normally ask a court to compare itself to others, it is appropriate in this situation to examine the types of sentences commonly imposed for this type of offense when the defendant's argument is not constrained by a stipulated minimum.  18 U.S.C. 3553(a)(6) (a sentencing court shall consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

Sentencing statistics from Colorado and elsewhere demonstrate that federal courts imposing sentences in child pornography cases frequently employ variances to deviate from a guideline sentence.  According to the Statistical Information Packet compiled by the United States Sentencing Commission for the District of Colorado, in 2018, variant sentences were imposed in 35.7% of child pornography cases in Colorado

and 62.7% of cases nationwide.  (Exhibit A - USSC Statistical Information Packet, Dist. Co. 2018 at 16).[2]  And while the courts in this District did not impose any sentences involving alternatives to prison in child pornography cases in 2018 (likely as a result of the Colorado U.S. Attorney's Office's policy noted in footnote 2), *id*. at 8, such sentences, including sentences to probation, were imposed in 3.3% of cases nationwide.  *Id.* at 10.[3]

The average sentence in 2018 for federal offenders convicted of possession of child pornography, absent a prior sex offense, was 55 months incarceration.  (US Sent. Comm'n Report on Mandatory Minimum Penalties for Sex Offenses in the Criminal Justice System, January 2019 at 46).  And the average child pornography sentence in recent years has grown significantly longer than in years past – increasing 500% between 1997 and 2010.   (Families Against Mandatory Minimums – Introduction to Child Pornography Sentencing at 1).  Yet even in 2010, federal courts varied or departed downward from the applicable guideline range in 44.3% of non-production child pornography cases.  (Exhibit B - US Sent. Comm'n Report to Congress [2012] at 224).

As Judge Kane has noted, the sentencing guidelines for child pornography are not based on "extensive empirical evidence" and most studies show that the guideline sentences are "greater than necessary" to effectuate the sentencing goals set forth in 18 U.S.C. § 3553.  *United States v. Cheever*, 2016WL3919792, *2 (D. Colo. 2016).  A downward variance may be appropriate, therefore, to account for the circumstances of a

---

[2]     On information and belief, it is the general policy of the Colorado U.S. Attorney's Office to refuse any plea agreement in a child pornography case that would provide a defendant the ability to argue for a sentence of probation or even a variance below 60 months.

[3]     By way of comparison, raw data provided by the State of Colorado shows that a probationary sentence is imposed in approximately 9% of child pornography cases prosecuted in state court.

particular defendant and a particular child pornography case while still reflecting the seriousness of the offense.  *See United States v. Henderson*, 649 F.3d 955, 962-64 (9th Cir. 2011) (discussing the history of the child pornography guidelines, noting that the guidelines were "not the result of empirical study" and that sentencing courts have addressed the perceived severity of the guidelines through "increased below-guidelines variance and downward departure rates," collecting cases holding that such variances are proper) (citations omitted); *United States v. Jackman*, 512 Fed. Appx. 750, 753 (10th Cir. 2013) (citing *Henderson* in noting that a court can commit procedural error by failing to recognize its discretion to vary from the child pornography guidelines based on categorical determination that the guideline ranges are greater than necessary to achieve the objectives of 18 U.S.C. § 3553(a)); *United States v. Autery*, 555 F.3d 864, 878 (9th Cir. 2009) (examining 18 U.S.C. § 3553(a) factors and upholding variance to probation in child pornography case).  This is such a case.

Joel accessed the illegal materials resulting in his conviction in 2012-13.  He is not alleged to have participated in the creation of any child pornography, only to have viewed images previously known to law enforcement as having been widely disseminated online. There is also no allegation or evidence that Joel accessed any unlawful materials between 2013, when law enforcement searched his home and seized his computer, and now.  Thus, while law enforcement waited six years to bring charges, Joel led a law-abiding life.

Indeed, even as the years passed and Joel became hopeful that charges would not be filed, Joel continued to use the time to work tirelessly to repair the damage he has

caused to his family.  In addition to working hard at his job to support his wife and child, Joel has been meeting regularly with a psychologist who describes him as having "made more progress than the vast majority of people I've treated in my career."  He describes Joel as "one of the exceptions – a person with serious problems who has been willing to address those problems head on in an open and transparent way and has gained immeasurable benefit from doing so."  (Exhibit C - Max Wachtel, Ph.D letter). Joel has actively participated in a treatment group for men seeking recovery from compulsive sexual behaviors, and his sponsor commends him as an "open, honest, and contrite" person who "takes full responsibility for his past mistakes" and is "committed to a lifetime of recovery, and being the best husband, father, brother and friend he is capable of being." (Exhibit D - Chris Gibley letter).  He has also completed additional course work offered for treatment of pornography and sex addiction by the Boulder-based Begin Again Institute. (Exhibit E - Begin Again Institute Certificate of Completion).

Joel has no prior criminal history and, due to his job, has undergone multiple background checks.  Joel has been living freely while he attempts to make amends for his misconduct, address the issues that led to his crime, and reestablish the trust and affection of his family.  The Government did not believe it necessary to remove Joel from the community during the six years in which this case was under investigation, or after charges were filed.  And there is nothing about Joel's history or the "characteristics of the defendant" to indicate that a lengthy prison sentence is required now.  Further, it is undersigned counsel's understanding that the government will not request that Joel be remand should a prison sentence be imposed.

Joel was born in Salt Lake City, Utah but moved to Colorado when he was one, after his parents' divorce. Joel's father George Steven (Steve) Thomas was awarded full custody of Joel and Joel had very limited contact with his mother for the duration of his childhood. Joel initially received occasional telephone calls from his mother, but they eventually ceased and Joel had no further contact with his mother until well into adulthood. Steve eventually met and married Lynne Edwards, who Joel considers his mother. The couple had no additional children. Joel's birth mother remarried and had six additional children, but Joel has no contact with them and effectively has no siblings.

When Joel was two, Steve, Lynne and Joel moved the Littleton, Colorado. Steve and Lynne both worked for local television stations, Steve on the technical side and Lynne on the business side. Joel grew up in Littleton, attending Jefferson County schools. His childhood was good, but eventful. When Joel was eight he was playing with friends when he fell twenty feet from a bridge, required flight-for-life transport to the hospital, and spent 12 weeks in traction and a body cast while healing from a badly broken femur. A few years later, at age eleven, Joel was riding his bike when he happened upon an individual who had crashed his motorcycle and was near death. Joel rushed home to procure his first aid kit and returned to the scene where he provided the victim chest compressions and comfort until an ambulance arrived. Based on these actions, the West Metro Fire Department awarded Joel a hero's merit award.

Joel generally did well in school, had many friends, did not have disciplinary problems, and excelled in sports, including tennis, track, football and basketball. He was also active in the Boy Scouts, eventually attaining the rank of Eagle Scout. The family

moved within Jefferson County several times, causing Joel to change schools during middle school and again in high school.

Joel struggled academically and socially in his one year at Chatfield High School but adjusted his attitude and, upon transferring to Dakota Ridge High School, he excelled. Joel was on the tennis and track teams at Dakota Ridge, and participated in student government.  Joel graduated from Dakota Ridge with a 3.6 grade point average.

Joel was a senior at Dakota Ridge in 1999 when the mass shooting occurred at nearby Columbine High School, where Joel had many friends.  Inspired by the acts of first responders that day, Joel decided to go into law enforcement.  Joel joined the United States Army Reserve in 1999 and completed six months of training that combined basic training and Military Police training.  He then enrolled at Northern Colorado University which he attended for one year until, after the September 11, 2001 terrorist attacks, Joel was called to active duty in the Army.

Joel was deployed as a Military Police officer at Fort Carson, policing the base and traveling the country apprehending and returning AWOL soldiers.  He was honorably discharged on 2007 with five years of active duty service, having earned two service medals.  (Exhibit H – DD-214).

During his year at Northern Colorado University, Joel met Valerie, whom Joel describes as his "actual soul mate."  The couple was married in 2004, and Valerie gave birth to their son Cooper in 2009.  (Exhibit F – Family Photos).

During Joel's childhood, his father transitioned from working for a television station to owning his own production company.  Joel spent much time as a child working for

Steve and learning the technical aspects of television production. Upon leaving the Army, Joel worked briefly for his father's company, then co-founded a DJ business which, by the time Joel sold his share of the business in 2012, employed numerous people, worked hundreds of events per year, and was considered a top-10 wedding entertainment business in the Denver area.

In 2012, Joel transitioned back into television production, taking a job with Game Creek Video, where he eventually rose to the position of Engineer in Charge (EIC) of a mobile broadcast unit for sports and other television productions for networks including ESPN, ABC, CBS, NBC, CNN, Fox Sports, and the SEC Network. As an EIC, Joel traveled 270-275 days per year, to major sports and other events all over the country, where he had primary responsibility for overseeing the technical aspects of the television broadcast from a broadcast compound located in trucks outside the venue or deep in the bowels of the stadium. Over his career, Joel engineered thousands of productions. In addition to all the major sports championships (including the Super Bowl, the World Series, and the College Football National Championship Game), Joel broadcast political town halls and debates, the State of the Union Address, and the Democratic and Republican National Conventions. As a result, Joel was subjected to, and passed, numerous background checks, including those conducted by the Secret Service. Joel earned approximately $125,000.00 per year working for Game Creek Video, providing 80% of his family's income. Joel's employment was recently terminated, after he informed the company of the charges in this case.

Joel has been living under the shadow of this case since the 2013 raid of his home. There are no indications that Joel has engaged in any illegal activity during that period. Joel has instead used the time to work on himself and his relationships, and his family has stood by him.  His father describes Joel as an "exceptional person" with "humility, empathy, and a love of life" who "knows that he's done something so wrong" but is "working hard making amends."  (Exhibit D - Steve Thomas letter).  His mother similarly states that "Joel is a good man" who "works hard, loves his wife Valerie and his little boy Cooper," and who she doubts "will ever forgive himself and will spend the rest of his life trying to make up for putting his family through this terrible, humiliating time."  (Exhibit D - Lynne Edwards-Thomas letter).  Until recently, Joel served as a volunteer with his son's Cub Scout pack, where the co-Scout Leader describes him as a dependable and enthusiastic leader and "shining example of how to be an involved father and husband while balancing a busy work and travel schedule."  (Exhibit D - Adam Lucere letter).

There is no question that all of Joel's accomplishments and respect within the community have been shattered by his actions of 2012-13.  Joel followed his darkest impulses and engaged in reprehensible conduct.  At the time Joel did not think about the impacts simply viewing exploitative material online has on the children in the images, but upon seeking treatment he came to realize that his was not a victimless crime.

Joel now fully understands and has acknowledged to his therapy group that each viewer represents a new violation of the victim.  But Joel's criminal acts are not the sum total of his character, as demonstrated by his lack of any other criminal history, the lengthy period between the search and the charges in this case, and Joel's acts to make amends

in the interim.  The characteristics of the defendant do not weigh in favor of a long period of incarceration.

**D.    A 63-month sentence is greater than necessary to serve the goal of deterrence and protect the public from future crimes of the defendant.**

The need "to provide adequate deterrence, [and] to protect the public" does not weigh in favor of a sentence as long as the 63-month sentence the government seeks. As to specific deterrence, the evidence does not show a compelling need for a lengthy period of confinement because, again, Joel has no other history of criminality in his 39-year lifetime and the government did not deem it necessary to seek incarceration during the six years since they became aware of his crime.

Regarding general deterrence, the many child pornography defendants in this district whose plea bargains do not allow for a downward variance, and the lengthy sentences that result, serve as ample notice that such activity will be prosecuted and punished as a serious federal crime.  An unduly lengthy period of incarceration for Joel is not necessary to make that point and, as reflected in the U.S. Sentencing Commission's statistics, the 63-month sentence sought by the government would actually be above the national average for a child pornography defendant without a prior sex offense.  (Exhibit I - US Sent. Comm'n Report on Mandatory Minimum Penalties for Sex Offenses in the Criminal Justice System, January 2019 at 46).

**E.    A sentence to confinement is not necessary to provide Joel with any needed correctional treatment in the most effective manner**.

A community based sentence would be adequate but not more than necessary to meet Joel's rehabilitative needs.  Joel sought rehabilitative therapy on his own before the

government brought its case and his treatment providers attest to his substantial progress.  He has also made substantial efforts to address the harm his actions have caused to his loved ones, and has agreed to make restitution to victims.  Incarceration will only serve to interrupt, rather than facilitate, Joel's rehabilitative efforts.  As his psychologist notes, "Joel would be losing a tremendous rehabilitative support system he has built for himself if he were to be incarcerated," as the treatment he has been enthusiastically pursuing "would not be possible in the Federal Bureau of Prisons . . . ." (Exhibit C - Max Wachtel Ph.D letter).  Joel has demonstrated over the last six years that he can be a productive, law-abiding member of society and he does not require confinement for treatment or rehabilitation.

    F.    Conclusion.

    Many child pornography cases result in sentences to incarceration similar to the 63 months the government is seeking here.  But a uniform sentence is not required in every case brought under 18 U.S.C. § 2252A.  By allowing Joel to remain free in the community for six years before pursuing his case and by agreeing to allow Joel to argue for a downward sentencing variance below 60 months, the government has acknowledged that Joel can be distinguished from the most culpable, dangerous and recidivist of such defendants.

    Joel, for his part, has demonstrated that he is aware of the wrongfulness of his conduct and does not intend to repeat it in the future. (Exhibit G – Joel Thomas Letter). His personal characteristics do not suggest a life of criminality, nor is a lengthy sentence required to serve as a deterrent.  A sentence "sufficient, but not greater than necessary"

to further the goals of 18 USC § 3553(a) in this case is a sentence substantially below the 63-month guideline sentence requested by the government.

Joel respectfully requests that the Court employ a variance and consider a sentence to probation as allowed by the governing statute.

Dated this 30th day of December 2019, in Denver, Colorado.

Respectfully submitted,

*s/ Douglas I. Richards*
Douglas I. Richards
**RICHARDS CARRINGTON, LLC**
1444 Blake Street
Denver, Colorado 80202
Telephone:303-962-2690
Facsimile:303-962-2691
doug@richardscarrington.com
*Attorney for Defendant* Joel Thomas

**CERTIFICATE OF SERVICE**

I hereby certify that on December 30th, 2019, I electronically filed the foregoing DEFENDANT'S MOTION FOR DOWNWARD VARIANT SENTENCE with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Alecia L. Riewerts
Alecia.Riewerts@usdoj.gov

Lauren Kupersmith
Lauren.Kupersmith@usdoj.gov

*Attorneys for the Government*

*s/ Ashli Pyles*

Ashli G. Pyles, Paralegal